**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

FILED

02 JAN -9 PM 4:39

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| ANTHONY HIGGINS and SAMMI HIGGINS, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| BANCBOSTON MORTGAGE CORPORATION; HOMESIDE LENDING, INC.; BARRY NICHOLS, COUNTRYWIDE HOMELOANS, INC., | ) ) ) ) ) |
| Defendants. | ) |

Civil Action No. CV-01-S-2337-NE

ENTERED

JAN 0 9 2002

### MEMORANDUM OPINION

Plaintiffs, Anthony Higgins and Sammi Higgins, purchased a residential property in Hanceville, Alabama. Defendant Barry Nichols, then a loan agent for BancBoston Mortgage Corporation, met with plaintiffs to qualify them for the home mortgage, defendant BancBoston Mortgage Corporation provided plaintiffs the loan to purchase the home, and defendant Countrywide Homeloans, Inc. subsequently purchased plaintiffs' mortgage from defendant BancBoston Mortgage Corporation.

Plaintiffs claim that defendants negligently, wantonly, and fraudulently assessed charges against plaintiffs' alleged late payments, and filed suit against defendants on August 13, 2001, in the Circuit Court for Cullman County, Alabama. Defendants removed the action to this court on September 17, 2001, invoking the court's jurisdiction pursuant to 28 U.S.C. § 1441 and § 1332. This action is before the court on plaintiffs' motion to remand the action to the Circuit Court for Cullman County, Alabama, on the grounds that complete diversity does not exist among the named defendants to justify this court's § 1332 jurisdiction. Upon consideration of the motion, briefs, and



evidentiary submissions, the court determines that plaintiffs' motion is due to be denied.

## I. STATEMENT OF FACTS

Plaintiffs first met defendant Barry Nichols ("Nichols") while he was an employee of BancBoston Mortgage Corporation ("BancBoston"), and plaintiffs were in the process of purchasing a home located at 2037 County Road 509, Hanceville, Alabama 35077-4208.[1] Plaintiffs are citizens of the State of Alabama; BancBoston is a Florida corporation doing business in Cullman County, Alabama; defendant Countrywide Homeloans, Inc. ("Countrywide") is a New York corporation doing business in Cullman County, Alabama; and Nichols is a citizen of the State of Alabama.[2]

Nichols interviewed plaintiffs to qualify them for their home mortgage, and BancBoston provided the financing for plaintiffs' home purchase.[3] Plaintiffs' BancBoston mortgage loan was originated on August 18, 1993.[4] In approximately late-1994 or early-1995, three or four of plaintiffs' mortgage payments to BancBoston were returned to them, uncashed, in an envelope.[5] Plaintiffs telephoned, and later met with Nichols at their home, to determine "what was wrong."[6] Nichols told plaintiffs that he had contacted BancBoston, and that "everything was taken care of, in order and current."[7] According to Sammi Higgins, Nichols explained that "he was sorry for any inconvenience, but that they was [sic] working on their computers ...."[8] Nichols did not offer any other explanation for the returned checks, but instructed plaintiffs to "mail the payments back in."[9]

---

[1] Complaint ¶¶ 8-9.

[2] *See id.* ¶¶ 1-3, 5-6.

[3] *Id.* ¶ 9.

[4] Opposition to Motion to Remand, Tab F (Second Affidavit of Laura Bondurant), at ¶ 2.a.

[5] Complaint ¶ 10; *see also* Plaintiffs' evidentiary submission, Tab 1 (Anthony Higgins deposition), at 30.

[6] Plaintiffs' evidentiary submission, Tab 1 (Anthony Higgins deposition), at 31.

[7] *Id.* at 31; *see also id.*, Tab 2 (Sammi Higgins deposition), at 37.

[8] *Id.*, Tab 2 (Sammi Higgins deposition), at 37.

[9] *Id.*, Tab 1 (Anthony Higgins deposition), at 31.

2

About the same time, in August of 1994, BancBoston transferred plaintiffs' home mortgage to defendant Countrywide.[10]  Plaintiffs received a letter stating that Countrywide had purchased plaintiffs' loan; the letter listed a toll-free number for plaintiffs to call, and stated that additional correspondence would follow.[11]  Plaintiffs contend that they contacted Countrywide, and

> were advised by an agent and/or an employee of Countrywide, who would not disclose their name to Plaintiffs, that Countrywide "had lost" their mortgage for some time when it was purchased from BancBoston but that Plaintiffs would be receiving a voucher from Countrywide in the near future and for them to pay the amount indicated on the voucher.  The agent and/or employee of Countrywide, represented to Plaintiffs that upon payment of their voucher, their account would be current and "everything would be taken care of."[12]

Plaintiffs assert that they received the voucher, and immediately paid the amount indicated.[13]  Plaintiffs subsequently received a statement of their account from Countrywide that reflected a late charge, however, and contacted Countrywide.  According to plaintiffs, a Countrywide representative told plaintiffs "not to worry about the late charges," that "they would be taken care of."[14]

Defendants contend that, on January 12, 1995, Countrywide sent plaintiffs a year-end statement that reflected that, as of December 31, 1994, plaintiffs owed $160.30 in accrued late charges on their mortgage.[15]  Countrywide's computer system contains a record to the effect that the January 12, 1995 statement was mailed to plaintiffs' home mailing address, and indicates also that the letter neither was returned to sender or otherwise undeliverable.[16]  The Countrywide computer system also contains records that plaintiffs were mailed similar year-end statements in 1995, 1996,

---

[10] *Id.* at 40-41.

[11] *Id.* at 38.

[12] Complaint ¶ 13.

[13] *Id.* ¶ 14.

[14] *Id.* ¶ 15.

[15] Opposition to Motion to Remand, Tab F (Second Affidavit of Laura Bondurant), at ¶ 2.b.

[16] *Id.*

and 1997, that all were mailed to plaintiffs' home mailing address, and that none of the statements were returned to Countrywide as undeliverable.  Each of those year-end statements reflected plaintiffs' accrued late charge balance.[17]  Plaintiffs testified that they did not receive any of these year-end statements.[18]

Defendants also argue that Countrywide mailed approximately fifty letters to plaintiffs, addressed to Anthony Higgins at plaintiffs' home mailing address, to inform them that "a late charge had been assessed and disclosing the total 'late charge balance' due" as of the date of the letters' mailing.[19]  According to Laura Guidici Bondurant, a Vice President in Countrywide's Collection Department, plaintiffs were assessed late charges on at least fifty occasions by Countrywide between September of 1994 and July of 1999, and were sent a letter each time a late charge was assessed, beginning in September of 1995.[20]  Defendants have submitted computer screen print-outs to reflect the mailing dates of these fifty letters.[21]

Anthony Higgins testified, however, that plaintiffs never received any of these late charge letters, and that the first such letter he received was in October of 2000.[22]  This was the case even though the fifty letters were mailed to the same address as plaintiffs' Countrywide mortgage payment bills, and although plaintiffs admit they have never had trouble receiving either the mortgage payment bill or any other bill mailed to their home.[23]  Sammi Higgins testified, alternatively, that she remembered receiving approximately twelve such letters over the course of

---

[17] *Id.* ¶ 2.c.

[18] *See, e.g.,* Plaintiffs' evidentiary submission, Tab 1 (Anthony Higgins deposition), at 65.

[19] Opposition to Motion to Remand ¶ 17; *see also id.,* Tab F (Second Affidavit of Laura Bondurant), at ¶ 2.g.

[20] *See id.,* Tab F (Second Affidavit of Laura Bondurant), at ¶ 2.g.

[21] *See id.,* Ex. F (Dates of Late Charge Letters Sent to Higgins).

[22] *See* Plaintiffs' evidentiary submission, Tab 1 (Anthony Higgins deposition), at 21.

[23] *See id.*

Countrywide's maintenance of plaintiffs' mortgage loan, and "close[] to the time that the loan was transferred to Countrywide."[24]  According to Sammi Higgins, the letters "would be just like a standard sized letter that said that a late fee had been assessed to the account."[25]  Despite this discrepancy, however, plaintiffs ultimately claim that they had no knowledge that any late fees were owed on their account at any time prior to October of 2000.[26]

Plaintiffs filed an action against defendants in the Circuit Court of Cullman County, Alabama on August 13, 2001, alleging that defendants were liable for negligence and/or wantonness, and fraud, because plaintiffs had relied to their detriment on defendants' alleged representations to plaintiffs "on numerous occasions" that late fees assessed on the account "would be taken care of" and "properly removed from their account," and because defendants allegedly had negligently or wantonly maintained plaintiffs' mortgage loan.[27]

Defendants removed the action to this court on September 17, 2001, pursuant to this court's 28 U.S.C. § 1332 jurisdiction.[28]  Plaintiffs have moved to remand the action to the Circuit Court of Cullman County.[29]

## II. DISCUSSION

It is a fundamental proposition that federal district courts are courts of limited jurisdiction, "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress." *University of South Alabama v. The American Tobacco Co.*, 168 F.3d 405,

---

[24] *Id.*, Tab 2 (Sammi Higgins deposition), at 83-84.

[25] *Id.* at 86.

[26] Motion to Remand at 8.

[27] *Id.* at Counts I-II.

[28] Notice of Removal (doc. no. 1).

[29] Motion to Remand (doc. no. 6).

409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)). Accordingly, an "Article III court must be sure of its own jurisdiction before getting to the merits" of any action. *Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 831, 119 S.Ct. 2295, 2307, 144 L.Ed.2d 715 (1999) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88-89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Federal courts thus are instructed to strictly construe removal statutes, and to resolve all doubts about jurisdiction in favor of remand to the appropriate state court. *See University of South Alabama*, 168 F.3d at 411.

The dispute presently before this court centers on the propriety of the court's subject matter jurisdiction under 28 U.S.C. § 1332. There is no dispute as to the fact that Barry Nichols's presence in this case destroys complete diversity among the parties,[30] ordinarily warranting remand to the state court.

Defendants allege that plaintiffs' inclusion of Nichols as a defendant is an attempt by plaintiffs to defeat this court's diversity jurisdiction, constituting "fraudulent joinder."[31] Defendants argue further that plaintiffs' claims against Nichols are time-barred by the Alabama statute of limitations for fraud actions, and that plaintiffs have not properly demonstrated the elements of a fraud claim against Nichols under Alabama law.[32] Defendants argue that Nichols was fraudulently joined as a defendant, and, thus does not destroy the court's diversity jurisdiction.

Plaintiffs contend, alternatively, that Nichols was not fraudulently joined, and allege that they have stated a viable cause of action for fraud against him. Plaintiffs argue that they did not have notice of the late fees at issue until October of 2000 (and thus filed suit within the two year statute of limitations for fraud), and that Nichols was intimately connected with the fraud

---

[30] *See supra* text accompanying note 2.
[31] Opposition to Motion to Remand at 2.
[32] *Id.* at 11-12.

6

complained of in this action, so as to satisfy the elements of a fraud claim under Alabama law.[33]

The doctrine of fraudulent joinder provides that, in a removal action, an action may be removable despite the lack of complete diversity "if the joinder of the non-diverse party ... [was] fraudulent." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998). Fraudulent joinder thus is an exception to the requirement that parties be completely diverse. *See id.*

Traditionally, courts have deemed a joinder fraudulent in two situations: "In a removal case alleging fraudulent joinder, the removing party has the burden of proving either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court." *Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1380 (11th Cir. 1998) (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997)). The Eleventh Circuit identified a third type of fraudulent joinder in *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353 (11th Cir. 1996). When "a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant." *Triggs*, 154 F.3d at 1287 (citing *Tapscott*, 77 F.3d at 1360).

At issue here is the first situation: defendants argue that "plaintiffs cannot possibly establish the essential elements of a fraud claim based on Nichols' alleged representations; and 2) any fraud claim the plaintiffs might have had against Nichols is now plainly barred by the statute of limitations." (Opposition to Motion to Remand at 9.)

In order to determine whether a defendant has been fraudulently joined, courts must examine the plaintiff's pleadings at the time of the removal, although it may also consider affidavits and deposition testimony submitted by the parties. *See Pacheco De Perez*, 139 F.3d at 1380. As with

---

[33] Motion to Remand at 7-10.

a Rule 56 motion for summary judgment, courts must evaluate that evidence in the light most favorable to the plaintiff, resolving any uncertainties about the applicable laws in the plaintiff's favor. *See id.* Accordingly, defendants' burden of establishing fraudulent joinder is a heavy one; "where a plaintiff states even a colorable claim against the resident defendant, joinder is proper and the case should be remanded to state court." *Pacheco de Perez*, 139 F.3d at 1380 (citing *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1561 (11th Cir. 1989)). The implication of this is that the plaintiff does not need to "have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate." *Triggs*, 154 F.3d at 1287.

Turning to defendants' statute of limitations argument, "[i]f the only claims against a resident defendant are barred by the statute of limitations, then there 'is no possibility the plaintiff can establish a cause of action against the resident defendant.'" *Whitlock v. Jackson National Life Insurance Co.*, 32 F. Supp. 2d 1286, 1290 (M.D. Ala. 1998) (quoting *Crowe*, 113 F.3d at 1538)). The court must determine, then, whether plaintiffs' claims against Nichols are barred by Alabama's two-year statute of limitations for fraud actions. *See* Code of Alabama § 6-2-38(*l*); *see also Foremost Insurance Co. v. Parham*, 693 So. 2d 409, 417 (Ala. 1997).

Under Alabama law, the two-year statute of limitations period for fraud begins to run once the alleged victim discovered, or reasonably should have discovered, the fraud. *See Foremost*, 693 So. 2d at 417. The victim's discovery of the alleged fraud is considered under a theory of "reasonable reliance," requiring this court to assess "all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties." *Id.* at 421. The court should consider whether these circumstances "would have put reasonable persons on notice" of the alleged fraud. *Id.* The alleged victim will not

8

be permitted to make a "deliberate decision to ignore written contract terms," although the "parties claiming fraud were fully capable of reading and understanding their documents." *Id.*

In late-1994 or early-1995, Nichols met with plaintiffs after their mortgage checks were returned from BancBoston, and assured them that their account was in order and current.[34] Plaintiffs emphasize that they have had no opportunity to conduct discovery, but suggest that evidence supplied by Countrywide reflects that late charges in the amount of $160.30 had accrued on plaintiffs' account at the time that Nichols made those statements to plaintiffs.[35] Plaintiffs also have submitted a "Transaction History Statement" that reflects that, in September of 1994, plaintiffs' loan account reflected a beginning balance late charge of $112.21.[36] The representations by Nichols that are the subject of plaintiffs' fraud claim against him thus occurred approximately *seven years* before plaintiffs filed suit in Cullman County Circuit Court.

Plaintiffs nevertheless contend that they did not have notice of these charges until October of 2000, because they did not receive late charge letters or year-end statements detailing those charges.[37] Even assuming plaintiffs' version of events is true, defendants assert that, since Countrywide assumed maintenance of plaintiffs' loan in 1994, plaintiffs received a statement (and admitted those statements' receipt)[38] every month that included a "late charge" notice.[39] A factual dispute exists as to the type of information that was contained on the monthly statements prior to May of 1997, at which time Countrywide changed the format of the monthly statements.[40] Even so,

---

[34] *See supra* text accompanying notes 5-9.

[35] Plaintiffs' Reply (doc. no. 14), at 10; *see* Motion to Remand at 8.

[36] *See* Motion to Remand, Ex. A (Affidavit of Anthony Higgins), at Ex. 1.

[37] *See supra* text accompanying notes 22-26.

[38] *See* Plaintiffs' evidentiary submission, Tab 1 (Anthony Higgins deposition), at 21, 64; *id.*, Tab 2 (Sammi Higgins deposition), at 102-03.

[39] Opposition to Motion to Remand at 20.

[40]

9

defendants claim that plaintiffs should have discovered the late charges on their account as of May of 1997, still four or so years prior to the filing of this action.  This is because the new format monthly statements sent to plaintiffs specifically listed late charges accrued on the account.[41]  These statements appeared as follows:

**Amount due on 04/01/2001 as of 03/28/2001**

| | |
|---|---|
| Home loan payment due 04/01/2001 | $446.00 |
| Past due payment amount | 1,620.00 |
| Fees due | 5.00 |
| Late charge | 776.90 |
| Partial payment balance | 540.00[42] |

Despite this listing of fees and charges, the tear-off remittance form at the bottom of the statement reads: "Payment due April 1, 2001: $446.00."[43]

Although defendants contend that this monthly statement should have put plaintiffs on notice of the alleged fraud by Nichols, both plaintiffs have testified in deposition that they did not understand the monthly statements.  For example, when she examined the March 28, 2001 mortgage statement sent to plaintiffs, Sammi Higgins explained in deposition:

> Q.   I want you to tell me what your understanding would be of what that means when it says "Late charge, seven hundred seventy-six dollars."
>
> A.   I have no earthly.  You also got "Past due payment, fee charges, late charges, partial payments," but yet it still says that I owe, for the month of April, four forty-six.
>
> Q.   Okay.

---

[41] *See* Defendants' evidentiary submissions, Tab G (Monthly Home Loan Statement).

[42] *Id.*

[43] *Id.*

A.    So that's what I paid.[44]

While the court agrees that these monthly mortgage statements may have been confusing to unsophisticated persons, plaintiffs have not established that they were "unsophisticated."[45] Moreover, it is troubling that plaintiffs have admitted that they did not bother to read the statements in full. Both plaintiffs testified that they intentionally did not read the monthly statements sent to them by Countrywide.  According to Anthony Higgins:

Q.    But typically, anytime that's really at issue in this lawsuit, generally; your practice was to take your bill, tear off the bottom and give the coupon to your wife and throw the rest in the garbage?

A.    That is correct.

Q.    So generally, you wouldn't have read what's at the top of that document?

A.    No, sir.[46]

...

Q.    [Y]ou've just told me, I believe, that typically what you did was tear off the coupon and throw the rest of it in the garbage?

A.    Correct.

Q.    Do you ever remember sitting down and reading the whole thing of one of those?

A.    No.

Q.    As far as you can recall, you never read the entire statement of one of those?

A.    No.[47]

The court agrees with defendants' observation that "[t]o the extent the plaintiffs were

---

[44] *Id.*, Tab D (Sammi Higgins deposition), at 78; *see also* Tab G (Monthly Home Loan Statement).

[45] *See infra* text accompanying notes 49-54.

[46] *Id.*, Tab C (Anthony Higgins deposition), at 20.

[47] *Id.* at 24-25.

ignorant of the fact that substantial amounts of late charges had been assessed against their loan, their ignorance was caused solely by their own deliberate failure to read" the statements they received each month by Countrywide.[48]  The implication of this fact is that, these monthly statements that "plaintiffs received ... *if read or even briefly skimmed would have put reasonable persons on notice that, contrary to [Nichols's] representation*," Countrywide records reflected that plaintiffs owed late charges on their mortgage. *Foremost*, 693 So. 2d at 421-22 (emphasis supplied).

Plaintiffs both have post-high school educations.[49]  *See Foremost*, 693 So. 2d at 421.  Both testified in deposition that they would have understood statements from Countrywide — like the monthly bills they received — that reflected "accrued late charges" to mean that "there was something wrong,"[50] and that plaintiffs owed late charges on the account.[51]  *See id.*  Plaintiffs also had used Countrywide's toll-free telephone number in the past to discuss other late charges assessed on the account.[52]  Further, although plaintiffs testified in deposition that they had been late in making their mortgage payments only "three or four times" over the life of the loan, the May 1997 Countrywide statement reflected $469.58.[53]  The size of this late charge amount would not be consistent with three or four late payments to Countrywide,[54] and, along with the "late charge" language on the statement, would have put a reasonable person on notice of the fraud complained of by Nichols.  *See id.*

---

[48] Opposition to Motion to Remand at 22.

[49] *See id.*, Tab C (Anthony Higgins deposition), at 11; *id.*, Tab D (Sammi Higgins deposition), at 13.

[50] *Id.*, Tab C (Anthony Higgins deposition), at 67-68.

[51] *See id.*, Tab D (Sammi Higgins deposition), at 82-83.

[52] *See id.*, Tab C (Anthony Higgins deposition), at 50.

[53] *See* Defendants' evidentiary submissions, Tab F (Second Affidavit of Laura Bondurant), Ex. B (May 1997 Monthly Statement).

[54] For example, the March 28, 2001 mortgage statement lists a late payment charge of less than $20.00 if payment is made later than April 1, 2001.  *See* Defendants' evidentiary submissions, Tab G (Monthly Home Loan Statement).

Consequently, the court finds that, in light "of all of the circumstances surrounding [the] transaction," plaintiffs should have been put on notice of Nichols's alleged fraud prior to October of 2000, when plaintiffs alleged that they first received notice of late charges assessed to their account. *Id.* As such, Alabama's two-year statute of limitations expired prior to plaintiffs' filing of their action against Nichols in August of 2001. *See* Code of Alabama § 6-2-38(*l*). There is thus "no possibility the plaintiff[s] can establish a cause of action against the resident defendant," and Nichols is deemed to have been fraudulently joined to this action — rendering this court's subject matter jurisdiction proper. *See Triggs*, 154 F.3d at 1287; *Pacheco de Perez*, 139 F.3d at 1380; *Crowe*, 113 F.3d at 1538; *see also* 28 U.S.C. § 1332.

Accordingly, plaintiffs' motion to remand this action is due to be denied. An appropriate order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this _9th_ day of January, 2002.

_____
United States District Judge

13